IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| ROTEC INDUSTRIES, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 05 C 2362 |
| v. | ) Hon. Mark Filip |
| | ) |
| ROTEK, INC., | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER

Plaintiffs, Rotec Industries, Inc. and Rotec-Leasco, Inc. ("Plaintiffs" or "Rotec"), filed a

lawsuit against Defendant, Rotek, Inc. ("Defendant" or "Rotek"), on April 21, 2005. (D.E. 23 (as

amended, the "Complaint").) The case is before the Court on Defendant's motion for summary

judgment on the ground that Plaintiffs' claims are barred by the applicable statute of limitations.

(D.E. 25.) Defendant previously filed a motion to dismiss the Complaint under Federal Rule of

Civil Procedure 12(b)(6) on account of the statute of limitations. (D.E. 10.) Based on exhibits

which were attached to Plaintiffs' response brief, it appeared that the suit was time-barred, but

such exhibits were not admissible in consideration of the Rule 12(b)(6) motion. *See, e.g., Travel*

*All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1430 (7th Cir. 1996). The

Court therefore denied the motion to dismiss without prejudice and granted Defendant leave to

raise the issue in a summary judgment posture. (D.E. 21.) As explained further below, the Court

grants Defendant's summary judgment motion.

I.    Background Facts[1]

On or about May 30, 1997, Plaintiffs sent Defendant a purchase order (Purchase Order

No. 54340) for five turntable bearings, which are products used in Plaintiffs' tower cranes. (Def.

SF ¶ 1.) Purchase Order No. 54340 provides, *inter alia*:

> Seller warrants to the buyer and its customers that all goods to be delivered under
> this order will be of merchantable quality, free from defects and will be safe for its
> intended use. Seller assumes all responsibility for claims asserted by any person
> growing out of the use, operation, or maintenance of the product, and agrees to
> indemnify, defend, and hold buyer harmless from all loss and expense arising
> from such claims.

(Pl. SF ¶ 1; D.E. 35 ("Oury Aff.") ¶ 4 & Ex. 1.)

In accordance with the parties' agreement, the bearings were shipped in three separate

shipments. (Def. SF ¶ 2.) Defendant shipped the first bearing to Plaintiff on December 2, 1997

via a customer pick up. (*Id.* ¶ 3.) With respect to the remaining four bearings, the parties entered

into two "bill and hold" agreements, under which Defendant held the bearings in consignment

until Plaintiffs arranged for payment and requested shipment. (*Id.* ¶ 4.) Under the first bill and

hold agreement, which the parties entered into on January 22, 1998, Plaintiffs agreed to take title

to two of the bearings as of January 23, 1998. (*Id.* ¶ 5.) Pursuant to this agreement, Defendant

shipped the bearings to Plaintiffs on February 2, 1998. (*Id.* ¶ 6.) A second bill and hold

agreement was entered on February 20, 1998 for the remaining two bearings, wherein Plaintiffs

---

[1]    The relevant facts are taken from Defendant's Local Rule 56.1 ("L.R. 56.1")
statement of facts ("Def. SF") (D.E. 27) and Plaintiffs' response thereto ("Pl. Resp. SF"), and
Plaintiffs' statement of additional facts ("Pl. SF") (D.E. 36) and Defendant's response thereto
("Def. Resp. SF"). (D.E. 38.) The underlying facts in this case are largely uncontroverted,
although the parties ascribe different consequences to them, as discussed herein. The Court
resolves all genuine factual ambiguities in the non-movant's favor. *Foley v. City of Lafayette*,
359 F.3d 925, 928 (7th Cir. 2004).

agreed to take title to the bearings as of February 20, 1998. (*Id.* ¶ 7.) Defendant held the two bearings in consignment, and shipped them to Plaintiffs on July 8, 1998. (*Id.*) Three of the bearings were installed in tower cranes that Plaintiffs sold to the China Three Gorges Project Corporation ("CTGPC") and were erected in China (the "China Bearings"). (Pl. SF ¶ 3.) The remaining two bearings were installed in Plaintiffs' tower cranes and erected in Venezuela (the "Venezuela Bearings"). (*Id.* ¶ 4.)

1.     The China Bearings

In July 2001, CTGPC notified Plaintiffs that the China Bearings were evidencing unusual and excessive wear. (*Id.* ¶ 5; *see also id.* ¶ 14 ("The China Bearings prematurely failed.").) Plaintiffs' chief operating officer, Robert Oury, met with representatives from Defendant on August 2, 2001 to investigate the cause of the problems reported by CTGPC and to assess, among other things, if there was a design or manufacturing defect in the bearings. (*Id.* ¶¶ 6-7.) This meeting took place at Plaintiffs' office in Elmhurst, Illinois. (*Id.* ¶ 7.) Chuck McGuigan, Defendant's service manager, and Phil Richardson, Defendant's vice president of engineering, attended on behalf of Defendant. (*Id.*; Def. SF ¶ 12.) Defendant sent Plaintiff a letter summarizing its findings from that meeting, which stated that "the subject bearings are in an advanced state of deterioration." (Pl. SF. ¶¶ 7-8; Def. SF ¶ 12 & Ex. 2.) The letter further stated that Defendant and its personnel were

> very familiar with the type of action, which would cause the metal pieces to break off of the case hardened raceway edges. The balls are supposed to make contact with the race surfaces at about mid-way between the race edge and its grease relief. When the bearing is properly installed and operated, the balls should never reach the edge of the hardened race. If they were to do so, the race edge is over loaded and edges break off the race. The metal pieces show this is exactly what has happened.

3

(Def. SF ¶ 12.) The letter did not suggest or even intimate that Defendant was the cause of any problems; in fact, Defendant's express and stated position was that the China Bearings were likely damaged during installation and also were not properly maintained in China. (*See, e.g.*, Def. SF ¶ 13 & Ex. 2 ("The bearing was very likely damaged to a degree at the initial installation and then the subsequent 2 years of use aggravated the distress and caused these failures.").) The installation and maintenance of the China Bearings was performed by CTGPC, the end-user. (Def. SF ¶ 14.)

On August 22, 2001, Mr. Richardson sent a letter to Steven Ledger, Plaintiffs' company president, stating that "[w]e [the Defendant] have rechecked the suitability of [the] Rotek bearing . . . and find it satisfactory." (Def. SF ¶ 15; *see also* Pl. SF ¶ 11.) On the same date, Mr. Richardson, Defendant's vice president of engineering, also submitted a "letter of approval" of the China Bearings for use in Plaintiffs' tower cranes, but cautioned that "[y]ou must recognize . . . that the ultimate suitability of a bearing for a particular application is dependent upon factors as to which we [*i.e.*, Defendant and its employees] have neither full knowledge nor control"—such as the duty cycle, which is "dependent upon the demands made on the particular piece of equipment by the ultimate user"; installation, for which Defendant "cannot be certain that the bearing mounting structures and the mounting bolts will be properly selected and preloaded"; and maintenance, "including bolt tightening and lubrication . . . [which is] beyond our control once we have shipped the bearing." (Def. SF ¶ 16 & Ex. 4.)

According to Plaintiffs' operative complaint, representatives from Plaintiffs and Defendant "inspected the tower cranes in China on August 11 and 12, 2001." (D.E. 23 at 4.) Mr. McGuigan and Todd Troyer, who also is a service manager for Defendant, were part of the China

4

visit and inspection, and they summarized their findings in a report dated August 28, 2001. (Def. SF ¶ 17.) The August 28, 2001 letter states that although Messrs. McGuigan and Troyer could not conduct a "full examination" without the crane being disassembled, they were able to make the following observations: "at assembly, the cranes machinery house is seen cantilevered—unsupported by another crane and reports generated by Rotec Inc. advise that all bearing mounting bolts are not in and fully tightened at that time"; "there is Rotec documentation of the bearing mounting bolts being found loose after the crane went to work"; and rust pitting was observed which is "indicative of an insufficient amount of grease being used." (*Id.* & Ex. 5.)

CTGPC, the end-user of the China Bearings, objected to Defendant's stated position that the problems were caused by improper installation and maintenance in China. (Pl. Resp. SF ¶ 18; Def. SF ¶ 18 & Ex. 6.) Mr. McGuigan, Defendant's service manager, replied to Plaintiff in a letter dated September 12, 2001: he explained that he and his colleagues' resumes "speak for themselves," that Defendant "successfully placed 250 bearings with diameters equal to or larger than [three meters]" since 1995, and that Defendant (collectively with its "sister . . . companies around the world") are the "world leaders in large bearing design and manufacture." (Def. SF ¶ 18 & Ex. 6.) In the letter, Mr. McGuigan further stated that Defendant's "position regarding these bearings [*i.e.*, that the problems were created by deficient steps of the end-user in China] as outlined in my August 28, 2001, report remains unchanged." (*Id.*) Defendant concluded the letter by stating, "[i]f your customer [*i.e.*, Plaintiff's customer, CTGPC] has information that appears to contradict our position, they should supply their calculations and expert/designer credentials for our review." (*Id.*) Again, Defendant said nothing in this letter that even suggested that it was liable for any problems.

5

Nearly a year and a half after forwarding CTGPC's objection to Defendant's position, Mr. Oury, Plaintiffs' COO, sent Defendant a letter dated January 20, 2003 regarding subsequent problems with the Venezuela Bearings. (Def. SF ¶ 19 & Ex. 10.) Plaintiff's letter acknowledges, in first referencing the China Bearings, that "[c]learly, the Chinese end user did not properly install or adequate lubricate any of their [China] bearings." (*Id.*) In a subsequent letter of May 29, 2003, Mr. Oury again confirmed Defendant's conclusions concerning the China Bearings. (*Id.* ¶ 20 & Ex. 12 ("[O]ur companies agree that the neglectful maintenance practices of [CTGPC] caused the bearings to fail in their cranes.").) Plaintiffs claim that Mr. Oury made these statements—essentially admitting that the China Bearings failed because they were improperly installed and maintained by CTGPC and not as a result of any design or manufacture defect by Defendant—based upon the representations of Defendant regarding the cause of the failure of those bearings. (Pl. Resp. SF ¶¶ 19-20 & Oury Aff. ¶ 22.) Mr. Oury avers that Plaintiffs also made these statements "based upon [Defendant] Rotek's conduct and involvement in the investigation of the deterioration of the China Bearings," which, according to Plaintiffs, led Plaintiffs to believe "that Rotek would remedy any defect in . . . [its] design or manufacture of the bearings . . . in accord with its contractual and warranty obligations." (Pl. SF ¶ 15 & Oury Aff. ¶ 10; *see id.* ¶ 16 & Oury Aff. ¶ 11 (referencing "Rotek's prior relationship with Rotec, reputation and its expertise as expressed by Chuck McGuigan from Rotek . . . [and] Rotek's representations and statements to Rotec contained in [the various] letters" discussed above).) Mr. Oury further states that, "[a]s a consequence, I did not direct Rotec to take any action against Rotek and did not authorize the filing of a lawsuit against Rotek at that time." (*Id.* ¶ 17 & Oury Aff. ¶ 11.)

6

### 2. The Venezuela Bearings

As mentioned above, there also were subsequent problems reported with the Venezuela Bearings, which problems are the subject of this lawsuit. Specifically, in or about August 2002, Plaintiffs' site office in Venezuela reported the failure of one of the two Venezuela Bearings. (Pl. SF ¶ 18.) Mr. Ledger, Plaintiffs' company president, sent an e-mail dated August 6, 2002 to Mr. Richardson, Defendant's vice president of engineering, requesting that Defendant investigate the problem and questioning whether the bearings were properly designed and selected. (*Id.*; Oury Aff. ¶ 12 & Ex. 7.) Mr. Richardson replied on August 8, 2002 via e-mail, reiterating Defendant's position that the design was appropriate, stating: "[r]egarding the design, I again confirm the bearing has adequate capacity for the loads supplied by Rotec assuming the structure is sound, the bolt tension is regularly checked and the bearing is well maintained." (Def. SF ¶ 21 & Ex. 7; Pl. SF ¶ 19.)

Mr. Ledger sent Mr. Richardson a letter dated August 8, 2002 describing Plaintiffs' position regarding the alleged deterioration of the Venezuela Bearings. (Def. SF ¶ 22 & Ex. 8.) The letter notes that one of the cranes had approximately 14,000 hours of service; asserts that such usage is not a high duty application; states that the bolts were properly tensioned, except for a few isolated exceptions; and states that the Venezuela Bearings had been greased frequently and generously. (Pl. SF ¶ 20; Oury Aff. ¶ 14 & Ex. 8.) In addition, the letter asserted that Defendant "needs to take a good look at this application." (Def. SF ¶ 22 & Ex. 8.) Mr. Richardson of Defendant replied via email on August 13, 2002, and stated that it appeared that the "raceway [of one of the bearings] is breaking up but as to the cause we are not sure if it is due to overload or corrosion or some other factor." (*Id.* ¶ 23 & Ex. 9; Pl. SF ¶ 21.)

Mr. Oury, Plaintiffs' COO, sent a letter to Mike Drobik, vice president of engineering for

Defendant, dated January 20, 2003, in which he expressed concern about the Venezuela

Bearings. (Def. SF ¶ 24 & Ex. 10.) The letter provided, in relevant part:

> One bearing was recently disassembled, and photographs have become available. A
> specific point of concern for us is an area of a raceway that looks like it was repaired
> during the manufacturing process. The photographs only show so much, but our field
> reports indicate that this "repaired" area is rough and could have initiated some of the
> problems with the bearing. The second bearing remains to be disassembled, but we
> expect to have it available for inspection soon.

> This all comes on the heels of similar problems with the [China Bearings]. So,
> you can understand our concern about the bearings, considering the fact that four
> out of five Rotek units in service have developed major problems within the first
> two years of use.

> * * * Clearly, the Chinese end user did not properly install or adequately lubricate
> any of their bearings. Our argument, however, is that we installed and lubricated
> [the Venezuela Bearings] according to Rotek procedures, yet those bearings are
> failing.

> We want to solve this problem quickly and like gentlemen. We believe your bearing
> design and/or manufacturing process are flawed.

(*Id.*; Pl. SF ¶ 22.)

Mr. Drobik responded in a letter dated February 7, 2003, in which he addressed Mr.

Oury's technical concerns regarding the aforementioned Venezuela Bearing. (Def. SF ¶ 25 &

Ex. 11; Pl. SF ¶ 23.)[2] The letter explained that there was, at least in Defendant's view, no

problem with the area of the raceway Plaintiffs referenced, as it is a purposefully incorporated

"soft spot" in the raceway. (Def. SF ¶ 25 & Ex. 11.) The letter explained that

> The soft spot is the section of the raceway that must remain unhardened to prevent
> overlap cracks during the induction hardening process. The area is then relieved via hand

---

[2]     At some point, the second of the Venezuela Bearings also prematurely
deteriorated. (Pl. SF ¶ 24 & Oury Aff. ¶ 20.)

grinding to ensure that the rolling elements do not contact the soft surface during operation. We discussed this process with Bruce Arndt in a recent telephone conversation.

In the letter, Defendant further stated, in relevant part:

We understand that the [Venezuela Bearings] were installed and lubricated by Rotec Industries, Inc. in accordance with our procedures. However, even with these precautions, the possibility of a problem exists if the slewing ring bearing experiences a severe overload resulting in core crushing or if the crane structure suffers degradation due to an unforeseen circumstance.

\* \* \* [W]e too would like to resolve this matter like gentlemen. *However, we must take exception to your comment that our design and/or manufacturing processes are flawed. To the contrary, our procedures, methods and processes are proven not only here in the U.S., but, through our parent and sister companies, worldwide ....* We do not intend to let you down and are willing to help with the wear analysis of the [Venezuela Bearings].

Rotec Industries, Inc. is a valued customer and we look forward to continuing the mutually beneficial business relationship we have enjoyed over the years.

(*Id.* (emphasis added).)

On or about May 29, 2003, or some ten weeks later, Mr. Oury responded to Defendant's letter. (Def. SF ¶ 26 & Ex. 12; Pl. SF ¶ 25.) In Mr. Oury's response, he stated that "[w]e have used Rotek bearings rather exclusively in our products with historically good results. However, we are not satisfied with the performance of your bearings in five of our cranes that are now out of service in China and Venezuela." (Def. SF ¶ 26 & Ex. 12.) As noted earlier, in this May 29, 2003 letter, Plaintiffs stated that "our companies agree that the neglectful maintenance practices of the Chinese caused the bearings to fail in their cranes." (*Id.*) However, the letter makes a demand, with respect to the Venezuela Bearings, for "replacement bearings that will live up to

our expectations." (*Id.*)[3] This demand was rejected by Defendant. (Pl. SF ¶ 27.) Following Defendant's failure to furnish replacement bearings, Mr. Oury authorized the filing of this lawsuit regarding the Venezuela Bearings. (Pl. SF ¶ 27 & Oury Aff. ¶ 23.) The suit was filed nearly two years after Mr. Oury made the demand for replacement bearings, on April 21, 2005. (D.E. 1; Def. Resp. SF ¶ 27.)

II.     Jurisdiction, Venue, and Choice of Law

The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states[4] and the amount in controversy exceeds $75,000, exclusive of interests and costs. (Plaintiffs claim some $323,000 in damages, concerning the Venezuela Bearings, plus prejudgment interest and costs. (D.E. 23 at 8.)) Venue in this district is proper pursuant to 28 U.S.C. § 1391, given that a substantial portion of events giving rise to this claim occurred in the Northern District of Illinois. With respect to choice of law, the parties have framed their briefs upon Illinois law. For choice of law purposes, "[t]he operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits." *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426 (7th Cir. 1991); *accord, e.g., Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470,

---

[3]      The parties agree that this demand is Plaintiffs' first demand for any replacement bearings, and that it came nearly five years after the last of the five bearings were delivered to Plaintiffs in July 1998. (Def. SF ¶ 26; Pl. Resp. SF ¶ 26.) Plaintiffs claim that "no prior express demand had been made because Rotek responded to Rotec's claim that the China Bearings were believed [sic] based upon Rotek's conduct with respect to the China Bearings that Rotek would remedy defects in the design or manufacture of the bearings." (Pl. Resp. SF ¶ 26.)

[4]      The Plaintiff companies are incorporated under Delaware law and have their principal place of business in Elmhurst, Illinois. (D.E. 23 ¶¶ 1-2.) Defendant is an Ohio corporation with its principal place of business in Ohio. (*Id.* ¶ 3.)

10

473 (7th Cir. 1991) (citation omitted). The Court therefore will apply Illinois law.

III.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment is properly granted on the basis of a statute of limitations defense when "'(1) the statute of limitations has run, thereby barring the plaintiff's claim as a matter of law, and (2) there exist no genuine issues of material fact regarding the time at which plaintiff's claim has accrued and the application of the statute to plaintiff's claim which may be resolved in plaintiff's favor.'" *Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002) (quoting *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1219 (7th Cir. 1984)) (further internal quotation marks and citation omitted).

IV.    Discussion

Defendant asserts that it is entitled to summary judgment because the four-year statute of limitations found in UCC § 2-725 (as codified in Illinois at 810 ILCS 5/2-725) bars this action. (D.E. 26 at 2.) Plaintiffs argue that two exceptions, equitable estoppel and fraudulent concealment, toll the limitations period. The Court finds that there is no genuine issue of material fact that the statute of limitations has run and that neither of the two exceptions apply in the case, as explained further below.

> 1.    The Four-Year Statute of Limitations Presumptively Applies Absent Some
>       Tolling Exception.

The statute of limitations for breach of contract and breach of express or implied

11

warranty actions with respect to contracts for the sale of goods is four years after the cause of action has accrued. *See* 810 ILCS 5/2-725(1). The cause of action accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made . . . ." 810 ILCS 5/2-725(2); *accord, e.g., Ridle v. Sprayrite Mfg. Co.*, 555 N.E.2d 1272, 1273 (Ill. App. Ct. 1990) (holding that time of delivery commences the limitations period).

There is no dispute that Plaintiffs' purchase order for the sale of the five turntable bearings constitutes a contract for the sale of goods. *See* 810 ILCS 5/2-105 (defining the term "goods" as "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale."); *accord, e.g., NIM Plastics Corp. v. Standex Int'l Corp.*, 11 F. Supp. 2d 1003, 1005 n.3 (N.D. Ill. 1998) (collecting authorities). The parties also do not dispute the relevant dates of delivery for the five bearings—and thus the dates on which the applicable four-year limitation periods started to run. (Pl. Resp. SF ¶¶ 8-10.) The first bearing had a date of delivery of December 2, 1997. (*Id.* ¶ 8.) The next two bearings were delivered from consignment to Plaintiffs on February 2, 1998. (*Id.* ¶ 9.) The final two bearings were delivered from consignment to Plaintiffs on July 8, 1998. (*Id.* ¶ 10.) This case was initiated on April 21, 2005 (D.E. 1), nearly seven years after the date of delivery with respect to the final two bearings. Put differently, there appears to be no dispute that this case is barred by the four-year statute of limitations absent some exception to the statute of limitations being applicable. As explained below, however, there is no triable case concerning whether either of the two putative exceptions to the limitations rule (*i.e.*, equitable estoppel or fraudulent concealment) applies, so summary judgment is warranted in favor of Defendant on statute of limitations grounds.

12

a. Equitable Estoppel Is Not Applicable[5]

Equitable estoppel tolls the running of a statute of limitations when a defendant has taken

active steps to prevent the plaintiff from suing. *See, e.g., Parks v. Kownacki*, 737 N.E.2d 287,

296 (Ill. 2000); *Shropshear v. Corp. Counsel of Chicago*, 275 F.3d 593, 595 (7th Cir. 2001). A

party claiming estoppel in this context must demonstrate that: "(1) the other party [*i.e.*,

Defendant] misrepresented or concealed material facts; (2) the other party knew at the time the

representations were made that the representations were untrue; (3) the party claiming estoppel

did not know that the representations were untrue when the representations were made and when

they were acted upon; (4) the other party intended or reasonably expected the representations to

be acted upon by the party claiming estoppel or by the public generally; (5) the party claiming

estoppel reasonably relied upon the representations in good faith and to their detriment; and (6)

the party claiming estoppel has been prejudiced by his reliance on the representations." *Parks*,

737 N.E.2d at 296 (citation omitted). The doctrine contemplates that "'the plaintiff has

discovered, or . . . should have discovered, that the defendant injured him, and denotes efforts by

---

[5]     There appears to be some authority in this circuit for analyzing the doctrines of equitable estoppel and fraudulent concealment as essentially the same theory. *See, e.g., Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Medical School*, 167 F.3d 1170, 1174 (7th Cir. 1999) ("[e]quitable estoppel—sometimes referred to as fraudulent concealment") (citing *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990) ("[e]quitable estoppel in the limitations setting is sometimes called fraudulent concealment")). However, *Singletary v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chicago*, 9 F.3d 1236 (7th Cir. 1993), teaches that "[a]lthough equitable estoppel is sometimes used interchangeably with fraudulent concealment [citing *Cada*], the latter is, strictly, a subset of the former . . . ." *Id.* at 1241 (citations omitted). For the avoidance of doubt, the Court analyzes the two doctrines separately, and, for the reasons set forth below, finds that both are inapplicable in the instant case.

the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time.'" *Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Medical School*, 167 F.3d 1170, 1174 (7th Cir. 1999) (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)) (punctuation in *Hentosh*); *accord, e.g.*, *Singletary v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chicago*, 9 F.3d 1236, 1241 (7th Cir. 1993) (applying Illinois law).

Caselaw emphasizes that tolling the limitations period is justified only when defendant has taken "active steps to prevent the plaintiff from suing, as by promising the plaintiff not to plead the statute of limitations pending settlement talks or by concealing evidence from the plaintiff that he needed in order to determine that he had a claim." *Singletary*, 9 F.3d at 1241 (Illinois citation omitted). In this regard, the "mere denial of liability . . . cannot be the foundation of an equitable estoppel. Otherwise statutes of limitations would be toothless; the only cases in which they could be successfully pleaded would be ones in which the defendant acknowledged liability. It is not the denial of liability or a refusal to cooperate in making the plaintiff's case that extends the statute of limitations, but affirmative efforts to delay the plaintiff's bringing suit." *Id.*, 9 F.3d at 1241 (collecting numerous Illinois cases; internal citations omitted); *accord, e.g.*, *In re Apex Automotive Warehouse, L.P.*, Nos. 96 B 04594 *et al.*, 2000 WL 220497, at *9 (N.D. Ill. Feb. 18, 2000) (Pallmeyer, J.) ("Actions such as promising the plaintiff not to plead the statute of limitations pending settlement talks or actively concealing evidence constitute affirmative efforts sufficient to toll the statute.") (citing *Singletary*, 9 F.3d at 1241); *American Heavy Trading, Inc. v. General Electric Co.*, No. 93 C 3609, 1996 WL 556742 at *6 n.8 (N.D. Ill. Sept. 27, 1996) (Grady, J.) (citing *Singletary*, 9 F.3d at 1241). Illinois law

14

incorporates a concept of due diligence as to a party seeking to invoke equitable estoppel. *See, e.g., Shropshear*, 275 F.3d at 598 ("[L]ack of due diligence is a defense under Illinois's doctrine of fraudulent concealment; it likewise is a defense under Illinois's umbrella doctrine of equitable estoppel.") (citing *Nickels v. Reid*, 661 N.E.2d 442, 447-48 (Ill. App. Ct. 1996)); *accord, Nickels*, 661 N.E.2d at 449 ("[T]he fraudulent concealment statute does not apply if the party affected by the [alleged] fraud might, with ordinary diligence, have discovered it.") (internal punctuation, emphasis and citation omitted).

With respect to its estoppel claim, Plaintiffs argue that "Rotek's conduct with respect to the China Bearings"—the only conduct or communications which occurred during the facially applicable limitations periods—"which occurred before the UCC statute of limitations had run, caused Rotec to believe that Rotek would remedy without resort to litigation any design or manufacture defect in those bearings in accordance with its contractual and warranty obligations." (D.E. 34 at 8.) Plaintiffs assert that, only after there were further problems with the Venezuela Bearings (the only bearings for which Plaintiffs claim damages in this suit[6]) did Plaintiffs conclude that Defendant's position concerning the China Bearings was false.[7] From

---

[6]     (*See* D.E. 23 at 7 ("At this time, Rotec retains possession of and title to only the cranes with the Venezuela Bearings. The failings of the Venezuela Bearings and Rotek's failure to replace them constitute breaches of . . . Rotek's express and implied warranties under the Uniform Commercial Code, 810 ILCS 5/2-313 . . . .").)

[7]     This sentence reads the record quite charitably to Plaintiffs in addressing their arguments. As mentioned above, Plaintiffs twice stated in letters that the problems with the China Bearings were caused by its client in China. (*See* Def. SF ¶ 19, Ex. 10 (January 20, 2003 letter of Mr. Oury, Chairman of Plaintiff Rotec Industries, Inc.) (acknowledging that, "[c]learly, the Chinese end user did not properly install or adequate lubricate any of their [China] bearings."); Def. SF ¶ 26, Ex. 12 (May 29, 2003 letter of Mr. Oury) (stating that, "our companies agree that the neglectful maintenance practices of the Chinese caused the bearings to fail in their cranes.").)

15

this, Plaintiffs assert that Defendant should be equitably estopped from relying on the facially applicable statute of limitations because Defendant falsely failed to admit that the Venezuela Bearings were defectively designed or manufactured.

This argument, with all respect, is not persuasive, and Plaintiffs have put forward no triable case or issue concerning the putative application of equitable estoppel. In this case, Defendant has been quite clear and quite open about its position that its Bearings—both the China Bearings and the Venezuela Bearings—were properly designed and made. Plaintiffs have failed to adduce any evidence that Defendant represented that it would resolve or remedy (or that it actually took steps to attempt to remedy) the alleged defects in the Venezuela Bearings without resort to litigation, that it would not plead the statute of limitations, or that Defendant actively concealed evidence concerning anything. *See Hentosh*, 167 F.3d at 1174 (defendant must take "active steps" to actively conceal the cause of action "such as by hiding evidence or promising not to plead the statute of limitations."); *Singletary*, 9 F.3d at 1241 (similar).

As stated, the record reflects that Defendant consistently denied liability for any of the purported problems. (*See, e.g.*, Def. SF ¶¶ 11-17; Pl. SF ¶¶ 10-11 (Defendant asserting that the China Bearings failed due to improper installation and maintenance by the end-user, CTGPC, and not due to any design or manufacturing defects).) Mere denials of wrongdoing or liability are not sufficient to carry the day on an estoppel claim. *Accord, e.g.*, *Singletary*, 9 F.3d at 1241. In addition, given Defendant's denial of liability, Plaintiffs' argument that they somehow were lulled into believing that the case concerning the Venezuela Bearings would be settled without any potential need for resort to litigation strains credulity. *See generally Arthur L. Larsen Co., Inc. v. Shefner*, 327 N.E.2d 257, 258 (Ill. App. Ct. 1975) (estoppel likely to be a factual issue in

16

the *opposite* situation; that is, where liability is not denied and only the amount to be paid by the eventual defendant is questioned in the interim negotiations) (collecting cases).

In this regard, the Court notes that the most Plaintiffs have potentially established—and this is likely charitable to Plaintiffs—is that Defendant's conduct could lead a reasonable commercial party to assume that Defendant would remedy any defects in its products, without resort to litigation, *if* Defendant acknowledged its goods were indeed defective. However, Plaintiff's theory requires a second and facially implausible corollary that finds no support in the record—namely, that Defendant would remedy any asserted problem with its goods without resort to litigation, even if Defendant denied liability, if its customer simply asserted that Defendant's goods were deficient. Plaintiffs offer no support for this extraordinary position—a position that is even more untenable when one appreciates that Defendant supplies crane parts that are used and maintained by third-parties, over whom Defendant has no control, on faraway continents halfway around the world from Defendant's Ohio factory and offices.

Moreover, to the extent Plaintiffs attempt to rely on the prior relationship between the parties, or Defendant's professed reputation and expertise with respect to bearings, such reliance is misplaced. (D.E. 34 at 3.) Plaintiffs have failed to cite a single case, and the Court is unaware of any, which holds that when one sophisticated commercial actor stands by its goods and credentials in speaking with its sophisticated commercial customer, that such failure to admit fault can constitute "affirmative acts" to conceal a cause of action or to prevent the plaintiff from suing in time, as required in this circuit for an estoppel. *Accord, e.g.*, *Singletary*, 9 F.3d at 1241 (requiring "affirmative efforts to delay the plaintiff's bringing suit"); *see also Arthur L. Larsen Co., Inc.*, 327 N.E.2d at 258 (holding that the "mere pendency of negotiations during the period

17

of a statute of limitations conducted in good faith and with a view of compromise" will not estop the defendant from asserting the statute of limitations) (collecting cases and authorities).

Although the circumstances discussed above are alone enough to defeat any invocation of equitable estoppel in the instant case, Plaintiffs also seem to have taken some steps to have investigated the matter on their own. (*See, e.g.*, Oury Aff. ¶ 9 (discussing the investigation of the China Bearings).) In this regard, Plaintiffs also were aware, at a minimum, that their client in China disputed the assertion of Defendant that the problems in China were the result of misdeeds or negligence of the Chinese client. Plaintiffs also do not contend that Defendants somehow were able to prevent Plaintiffs from initiating further investigations in China or Venezuela if Plaintiffs had wanted to do so. *See, e.g.*, *Shropshear*, 275 F.3d at 598 ("[L]ack of due diligence is a defense under Illinois's doctrine of fraudulent concealment; it likewise is a defense under Illinois's umbrella doctrine of equitable estoppel.") (citing *Nickels*, 661 N.E.2d at 447-48).

Plaintiffs' reliance on *Axia Inc. v. I.C. Harbour Constr. Co.*, 501 N.E.2d 1339, 1345 (Ill. App. Ct. 1986), is off the mark, as the case involved materially different facts. *Axia* addressed whether the defendant's efforts to repair estopped that defendant from asserting the statute of limitations as a bar to a cause of action. *Id.*, 501 N.E.2d at 1345. In *Axia*, the plaintiff notified the defendant of the problems that were the subject of the suit within one year of completion of the building; the defendant performed corrective work on the building on numerous occasions over a four-year period; and, when the corrective measures failed to fix the problem, the defendant sent experts to examine the premises and suggested various actions to the plaintiff. *Id.* It was only when the parties could not agree on further action that the lawsuit was filed. *Id.* *Axia* was careful to note that the defendant in that case "was not merely engaging in negotiation

18

and investigation of the problems, but took affirmative steps to remedy the matters in apparent acknowledgment of its responsibility under the contract." *Id.* at 1346. In contrast, in the case *sub judice*, Defendant merely investigated the problem that Plaintiffs identified (*see, e.g.,* Pl. SF ¶ 7) and traded several letters and e-mails, in which Defendant, among other things, steadfastly stood by its products and never even hinted that Defendant was culpable in any way. Plaintiffs have failed to adduce any evidence that Defendant even made an offer to take affirmative steps to repair the China Bearings or Venezuela Bearings. Moreover, far from admitting liability, Defendant denied any responsibility for the alleged premature failure of the China Bearings and the Venezuela Bearings (*see, e.g.,* Def. SF ¶ 17) and, even after Defendant refused Plaintiffs' demand for replacement of the Venezuela Bearings, Plaintiffs waited nearly two years to file this case. (Def. Resp. SF. ¶ 27.) Given Defendant's steadfast denials of responsibility, this case cannot fairly be analogized to *Axia*.

Plaintiffs also attempt to rely on communications between the parties regarding the Venezuela Bearings, which occurred after the expiration of the limitation period, on a "continuing conduct" theory. (*See, e.g.,* Pl. SF ¶ 18.) *Axia,* however, teaches that where, as here, "there is no pre-expiration conduct sufficient to induce any reasonable reliance, the post-expiration conduct illustrates nothing." *Id.,* 501 N.E.2d at 1345 (citing *Hurtt v. Davidson,* 406 N.E.2d 90, 93 (Ill. App. Ct. 1980)); *see also Hurtt,* 406 N.E.2d at 93 (reasoning that "[o]nce the limitations period had run, the plaintiff had no possibility of recovery . . . .").

In any event, and independently, the post-expiration communications in the instant case do not suggest that Defendant hid evidence, delayed Plaintiffs in bringing suit, or otherwise promised not to plead the statute of limitations. Defendant never acknowledged liability

19

concerning the Venezuela Bearings, and Defendant did not admit any liability or acknowledge any responsibility for damages or repairs. (Def. SF ¶ 25 & Ex. 11.)

Finally, Defendant's statement that it wanted to "resolve this matter like gentlemen" (Def. SF, Ex. 11 (Defendant's letter of February 7, 2003) simply echoed an earlier, almost identical statement of Plaintiffs. (Def. SF, Ex. 10 (Mr. Oury letter of January 20, 2003).) No reasonable actor or fact-finder, with all respect, could conclude that Defendant's desire to "resolve this matter like gentlemen" meant that Defendant would simply *concede* liability if Plaintiffs suggested that concession was appropriate—any more than any reasonable actor would contend that Plaintiffs were similarly promising not to sue Defendant or invoke their legal rights if Defendants did not agree with Plaintiffs about the cause of the problems with the bearings. Moreover, Defendant's statement that it was willing to "help with the wear analysis" of the Venezuela Bearings (Def. SF, Ex. 11) is typical of negotiations between sophisticated commercial parties, particularly between a supplier and a customer; such a statement is not an express or implicit representation that Defendant was culpable. *Accord, e.g., Arthur L. Larsen Co., Inc.*, 327 N.E.2d at 258 ("The mere pendency of negotiations during the period of a statute of limitations conducted in good faith and with a view of compromise" is insufficient to estop the defendant). Given the commercial sophistication of the parties, the Court declines to hold that such statements are somehow untoward; to conclude otherwise would discourage, if not chill, the great majority of settlement discussions. In short, even if these statements had been made prior to expiration of the limitations period, they would not warrant tolling the limitations period.

In sum, nothing in the record suggests that there is a triable case of equitable estoppel. The facially applicable statute of limitations, under which this case is untimely, applies.

20

### b. Fraudulent Concealment Is Not Applicable

Plaintiffs also fail to show that there is a triable case or issue concerning fraudulent concealment. The Illinois fraudulent concealment statute provides:

> If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of actions, and not afterwards.

735 ILCS 5/13-215. Where a plaintiff claims that the fraudulent concealment of a cause of action has tolled the statute of limitations, the plaintiff must demonstrate that the defendant "made misrepresentations or performed acts which were known to be false, with the intent to deceive the plaintiff, and upon which the plaintiff detrimentally relied." *Foster v. Plaut*, 625 N.E.2d 198, 203 (Ill. App. Ct. 1993) (collecting cases) (rejecting plaintiff's fraudulent concealment argument and granting defendant's motion to dismiss plaintiff's claims because they were not timely filed). Similar to equitable estoppel, to sustain a fraudulent concealment claim, the plaintiff must show that the defendant made "affirmative acts or representations which are calculated to lull or induce a claimant into delaying filing of his claim, or to prevent a claimant from discovering his claim." *Smith v. Cook Cty. Hosp.*, 518 N.E.2d 336, 340 (Ill. App. Ct. 1987); *accord, e.g., Foster*, 625 N.E.2d at 203 (plaintiff must present evidence of "affirmative acts by the defendant which were designed to prevent, and in fact did prevent, the discovery of the claim.") (collecting cases). A corollary to the affirmative act requirement is that "[m]ere silence of the defendant and the mere failure on the part of the plaintiff to learn of a cause of action do not amount to fraudulent concealment." *Foster*, 625 N.E.2d at 203 (collecting cases); *accord, e.g., In re Apex Automotive Warehouse, L.P.*, 2000 WL 220497, at \*9 ("In order to

21

invoke the doctrine of fraudulent concealment, 'there must be affirmative acts or representations which are calculated to lull or induce a claimant into delaying filing of his claim or to prevent a claimant from discovering his claim.'") (quoting *Smith*, 518 N.E.2d at 340); *Dancor Int'l Ltd. v. Friedman, Goldberg & Mintz*, 681 N.E.2d 617, 623 (Ill. App. Ct. 1997). Further, even where a plaintiff has produced evidence tending to show that the defendant's conduct constituted fraudulent concealment, which actually prevented discovery of the claim, the limitations period will not be tolled "where the plaintiff could have discovered the cause of action with the exercise of ordinary diligence." *Foster*, 625 N.E.2d at 203 (internal citation omitted).

As stated above, Plaintiffs have failed to adduce any evidence that Defendant inequitably or illicitly lulled or induced Plaintiffs into delaying the filing of this suit or otherwise prevented Plaintiffs from discovering their claims. There simply is no basis in the summary judgment record for a factfinder to conclude (I) that Defendant made a misrepresentation, (ii) that Defendant knew to be false, and (iii) upon which Plaintiffs detrimentally relied. Plaintiffs correctly point out that issues of intent and reliance—part of any fraudulent concealment claim—sometimes cannot be fairly resolved via summary judgment. However, where, as here, there is no evidence in the record of any concealment, misrepresentation, or some other affirmative step to lull Plaintiffs into believing they did not need to file a lawsuit, summary judgment is appropriate.[8]

---

[8]     The Court also notes that the evidence in the record tends to show that Plaintiffs could have discovered the cause of action against Defendant with ordinary diligence. *Accord, e.g., Foster v. Plaut*, 625 N.E.2d 198, 203 (Ill. App. Ct. 1993) (diligence requirement applies to fraudulent concealment); *see also Shropshear v. Corp. Counsel of Chicago*, 275 F.3d 593, 598 (7th Cir. 2001) (observing that the diligence requirement also applies to the equitable estoppel doctrine). Plaintiffs knew as of July 2001 that the China Bearings were having difficulties (*see* Pl. SF ¶ 5) and its China customer also rejected the Defendant's assertion that the problems were

In an apparent attempt to avoid the consequence of the lack of evidence justifying the tolling of the applicable statute of limitations, Plaintiffs vaguely argue that "no discovery has occurred" and that "additional facts regarding Rotek's intent to mislead . . . and to conceal Rotec's action . . . are known to agents and employees of Rotek, who are hostile . . ., and therefore cannot be furnished as part of [Plaintiffs'] response to the motion for summary judgment." (D.E. 34 at 7; *see also* Pl. SF ¶ 29 & Oury Aff. ¶ 24.) The Court respectfully rejects this argument. Plaintiffs do not invoke Federal Rule of Civil Procedure 56(f); however, that is the applicable rule when a non-movant would request additional discovery and time to respond to a summary judgment motion. The rule provides: "[s]hould it appear from the affidavits of a party opposing [a summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may . . . order a continuance to permit . . . depositions to be taken or discovery to be had . . . ." Fed. R. Civ. P. 56(f). Plaintiffs (two represented and sophisticated international business actors) have not filed any Rule 56(f) motion requesting additional discovery, nor do they contend that Defendant has refused to provide any legitimate discovery that was sought. It is significant that Plaintiffs did not and do not ask for additional time to take discovery in order to respond to the summary judgment motion, but instead merely contend that the fact that they have not conducted discovery somehow

---

caused by defective maintenance and installation in China; Plaintiffs had nearly one year to investigate the difficulties with the aid of independent engineers or experts and initiate suit within the applicable limitations period, but declined to do so. In short, Plaintiffs "unquestionably had sufficient knowledge to cause it to inquire further of a possible actionable wrong by [Defendant]." *Dancor Int'l v. Friedman, Goldberg & Mintz*, 681 N.E.2d 617, 623 (Ill. App. Ct. 1997). To the extent Plaintiffs looked into the subject of the China Bearings, it appears that Plaintiffs agreed with Defendant that the defects were the product of failings in China, as Plaintiffs twice told Defendant in the previously referenced letters.

creates a genuine issue of material fact. While the Court is typically quite flexible when a non-movant files a Rule 56(f) motion, the Court will not excuse sophisticated commercial parties' failure to seek additional time for discovery, particularly when the commercial parties do not even suggest that the other party (*i.e.*, Defendant) refused to cooperate in discovery that was issued. *See generally, e.g., Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (affirming grant of summary judgment against plaintiff for failure to adduce actual admissible evidence in support of a contention and explaining, "[a]s we have often stated, summary judgment 'is the "put up or shut up" moment in a lawsuit . . . .'") (collecting cases and quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).[9]

This position of the Court is buttressed by the fact, as explained above, that Plaintiffs are essentially contending not only that Defendant led them to believe that it would remedy any design defect without Plaintiffs needing to file any lawsuit (a position on which Plaintiffs *might* be able to create a jury question), but also and relatedly that Defendant somehow suggested to Plaintiffs that Defendant would remedy any putative design defect without litigation if Defendant believed no such defect existed but Plaintiffs expressed a contrary view. Plaintiffs have wholly failed to create a triable case on the second, facially counter-intuitive position. An essential element of Plaintiffs' estoppel and fraudulent concealment claims is reasonable and detrimental

---

[9]     The Court does not read the Seventh Circuit's precedent in cases like *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104 (7th Cir. 2004), as casting any skepticism towards appropriate Rule 56(f) motions, if they are actually filed and properly supported. However, where, as here, the Plaintiffs did not file any such motion and do not suggest that Defendants refused to answer legitimate discovery that was tendered, the Seventh Circuit's consistent and pointed teaching about how summary judgment requires parties to "put up or shut up" means that a non-movant cannot avoid an otherwise appropriate grant of summary judgment by simply noting that its adversary's employees might be hostile witnesses.

24

reliance (*see supra*), and Plaintiffs need no discovery to be able to explain the information on which they ostensibly relied upon in waiting almost three years to file this suit after expiration of the applicable limitations period. Plaintiffs have failed to identify such information, so it is unlikely that a Rule 56(f) motion would have been appropriate even had one been filed, which it was not in any event.

Finally, the Court notes that foreclosing a litigant from bringing its claim might seem harsh, but precedent teaches that courts have to draw the lines somewhere—statutes of limitations protect important social interests. *See, e.g., Singletary*, 9 F.3d at 1244 ("Statutes of limitations serve important public purposes."); *Cada*, 920 F.2d at 452-53 ("Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy, and repose."). What is more, in this case, Plaintiffs (two corporate actors engaged in international trade on multiple continents) are not just a couple of days outside the limitations period; the limitations period expired nearly three years prior to Plaintiffs' initiation of this suit, and Plaintiffs have failed to adduce any evidence that Defendant prevented them from discovering their cause of action or lulled them into believing that a lawsuit was not necessary. Quite the contrary, as stated above, the evidence before the Court reflects that, during the limitations period, Plaintiffs and Defendant performed a preliminary investigation of the bearings and Defendant denied responsibility for the premature failure of the China Bearings. Throughout the entire time period in question, Defendant steadfastly expressed its position that the various bearings were good crane parts that would function well if properly installed, maintained, and used. Plaintiffs have no legitimate claim to being misled, nor any legitimate basis to contend that

25

Defendant ever even hinted that Defendant was prepared to abandon its own analysis of the merits of its bearings if Plaintiff elected to disagree with Defendant's position. Moreover, the Court notes that, even after the limitations expired, Plaintiffs waited approximately two years to file this suit after Defendant refused to replace the Venezuela Bearings.

Plaintiffs were not required to accept Defendant's claim that it was not liable, but Plaintiffs also needed to abide by the facially applicable statute of limitations provided by the law and to file a timely lawsuit if Plaintiffs were not satisfied with Defendant's steadfast denials of liability. The facially applicable limitations period applies in this case, and under it Plaintiffs' putative claims are time-barred. Accordingly, the Court grants Defendant's summary judgment motion on statute of limitations grounds.

V.     Conclusion

Plaintiffs have not pointed to any facts raising a genuine material issue that would defeat Defendant's motion for summary judgment. (D.E. 25.) For the reasons set forth above, Defendant's motion for summary judgment is granted.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: 7/19/06

26